1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Matthew J. Preusch (CSB No. 298144)
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497
mpreusch@kellerrohrback.com

*Attorney for Plaintiffs*
*[Additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

RAMIN SARTIP, DARREN
HONEYCUTT, AND AHMED ABDI,
ON BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY
SITUATED,

                    Plaintiff

v.

FORD MOTOR COMPANY,

                    Defendant.

No. 2:19-cv-5905

**COMPLAINT – CLASS ACTION**

**JURY DEMAND**

COMPLAINT – CLASS ACTION
()

## Table of Contents

I. INTRODUCTION .................................................................................1

II. NATURE OF THE ACTION .............................................................1

III. PARTIES ...........................................................................................4

    A. Plaintiffs ................................................................................4

    B. Defendant ...............................................................................6

IV. JURISDICTION AND VENUE ........................................................6

V. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS ...................7

    A. Fuel Economy is Important to Prospective Vehicle
       Buyers .......................................................................................7

    B. Ford Touts the Fuel Efficiency of the Class Vehicles ........9

    C. Government Regulation of Fuel Economy Reporting .....................11

    D. Overview of Ford's Road Load Testing.............................18

    E. Overview of Plaintiffs' Testing Results ...........................21

    F. Ford Admits That Its Fuel Economy Ratings Are Suspect ...............30

VI. CLASS ACTION ALLEGATIONS ...............................................34

    A. Class Definitions ..................................................................34

    B. Class Certification Requirements.......................................35

VII. ANY APPLICABLE STATUTES OF LIMITATION ARE
     TOLLED ..........................................................................................38

    A. Discovery Rule .....................................................................38

    B. Equitable Tolling .................................................................38

    C. Equitable Estoppel................................................................39

COMPLAINT – CLASS ACTION
(8:19-cv-01292) - i

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

VIII.   CLAIMS FOR RELIEF ....................................................................39

      A.    Claims Asserted on Behalf of the Nationwide Class ........................39

      B.    Claims Asserted on Behalf of the State Classes ..............................48

IX.    PRAYER FOR RELIEF ........................................................................64

X.    DEMAND FOR JURY TRIAL ..............................................................65

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## I.    INTRODUCTION

Plaintiffs Ramin Sartip, Darren Honeycutt, and Ahmed Abdi, individually and as representatives of a class of similarly situated persons, by their undersigned counsel, allege as follows:

## II.    NATURE OF THE ACTION

1.    This action relates to Defendant Ford Motor Company's ("Ford") promotion and sale of vehicles, including the 2019 Ford Ranger and, on information and belief, the 2017-2019 Ford F-150 trucks ("Class Vehicles"), with overstated fuel economy ratings. These vehicles are and were advertised on the basis of specific estimates of the fuel economy for each vehicle. In reality, Ford cheated on the fuel economy calculations, thereby rendering its fuel economy labels misleading and deceiving consumers into purchasing vehicles that did not and do not offer the fuel economy advertised.

2.    Based upon the proprietary investigation of counsel and testing by Plaintiffs' experts, the fuel economy reported on the Monroney and other window stickers at the point of sale of Class Vehicles has been overstated.

3.    Specifically, Plaintiffs' testing has revealed that Ford miscalculated the road load used in fuel economy calculations by manipulating certain testing parameters. Approved fuel economy testing methodology involves a dynamometer that allows a vehicle to simulate driving by placing its wheels on rollers, like a giant treadmill. To ensure that the dynamometer is testing real-world driving, the testers must calculate a measurement called "road load." Road load refers to the sum of forces acting on a

vehicle, including aerodynamic drag, friction, and tire-related losses. The automaker must ensure that the road load calculation conforms to Environmental Protection Agency ("EPA") standards for calculating road load.

4.      By misrepresenting the road load for the Class Vehicles, Ford was able to produce unrealistic results in dynamometer testing that would not reflect the reality of on-road vehicle performance. Therefore, the tested models for the Class Vehicles reported higher fuel efficiency than the actual fleet of Class Vehicles that Ford marketed and sold or leased to Plaintiffs and other consumers in the United States.

5.      Further, before entering the Class Vehicles into the stream of commerce, Ford was required to obtain a Certification of Conformity ("COC") from the EPA, which includes a representation of fuel economy. Certification requires that the tested vehicle be identical in all material respects to the vehicles produced. Thus, by misrepresenting the road load specification, Ford fraudulently obtained its COC certifications for the Class Vehicles.

6.      Due to Ford's cheating on fuel economy testing and misrepresentation of road load specifications, the vehicles sold and leased to Plaintiffs and the Class members are not what Defendant promised. For example, Ford advertised the 2019 Ranger as "the most fuel-efficient gas-powered midsize pickup in America."[1] In reality, the Ranger does

---

[1] *2019 All-New Ranger: Accessible Ranger Brochure PDF*, Ford, 3 (2019), https://www.ford.com/services/assets/Brochure?bodystyle=Truck&make=Ford&model=Ranger&year=2019 (last visited June 5, 2019).

not meet its EPA-estimated fuel economy ratings because those ratings were based on Ford's fraudulent manipulation of the testing scheme.

7.     Ford's warranties, advertising, and other statements about the Class Vehicles' legal compliance and fuel efficiency are false and misleading. Ford has not corrected its misstatements and omissions or disclosed to consumers the true nature of the Class Vehicles. Ford has, however, announced an internal investigation into its road load and efficiency calculations, starting with the 2019 Ford Ranger. In addition, Ford is the subject of an ongoing criminal investigation by the U.S. Department of Justice with respect to its road load and efficiency calculations.

8.     Plaintiffs and Class members each purchased or leased a Class Vehicle in the United States.

9.     Through its misrepresentations to regulators and to consumers, Defendant induced Plaintiffs and Class members to purchase or lease the Class Vehicles, which do not perform as represented. Plaintiffs and Class members paid more for their Class Vehicles than they otherwise would have and have had to pay higher fuel costs than they would have paid had the Class Vehicles performed as advertised. Plaintiffs and Class members would not have purchased or leased the Class Vehicles had they known the truth of Defendant's fraudulent scheme.

10.     Plaintiffs and Class members suffered economic damages at the time of purchase of their Class Vehicles, which were not as advertised by Ford. These damages have continued to accrue as Plaintiffs and Class members have incurred higher operating

3

costs than they would have had the vehicles performed as advertised, in that they have had to pay for more fuel to operate their vehicles than the advertised fuel economy ratings would have required and have expended time and resources to fill their vehicles more frequently than the advertised fuel economy ratings would have required. These vehicles have also diminished in value and will continue to diminish in value when Ford downgrades their published fuel economy ratings.

11.     On behalf of themselves, the Nationwide Class, and the State Classes, Plaintiffs hereby bring this action for violations of the Magnuson–Moss Warranty Act (15 U.S.C. § 2301 et seq. ("MMWA")); for violations of state consumer protection laws; and for common law fraud, contract, warranty, and unjust enrichment claims.

12.     Plaintiffs seek monetary damages, restitution, and injunctive and other equitable relief. In addition, Plaintiffs and Class members are entitled to a significant award of punitive or exemplary damages because Defendant deliberately deceived Plaintiffs and Class members for a period of years.

### III.     PARTIES

**A.     Plaintiffs**

13.     Plaintiff Ramin Sartip, a resident of San Louis Obispo, California, purchased a 2017 F-150 with a 3.5L EcoBoost engine in June 2019 for approximately $52,995 from Findlay Chrysler Dodge Jeep Ram in Findlay, Ohio. Plaintiff Sartip reviewed the window sticker on the vehicle and relied on the fuel economy numbers thereon when purchasing the truck. Had Plaintiff Sartip known the truth about the fuel economy of the Class

4

Vehicle, he would have paid less for it or would have chosen to purchase a competing vehicle.

14.    Plaintiff Darren Honeycutt, a resident of Billings, Missouri, formerly owned a 2018 F-150 with 2.7L EcoBoost engine. He purchased the Class Vehicle in January 2018 for approximately $45,505 from Don Vance Ford in Marshfield, Missouri. Due to the poor fuel economy he experienced, Plaintiff Honeycutt traded in the truck in April 2018, at a value of approximately $31,230. Plaintiff Honeycutt was aware of commercials advertising the Ford EcoBoost before he went to purchase the vehicle, and reviewed the Monroney sticker on the Vehicle and relied on it when purchasing the truck. Had Plaintiff Honeycutt known the truth about the fuel economy of the Class Vehicle, he would have paid less for it or would have chosen to purchase a competing vehicle. Plaintiff Honeycutt, due to misrepresentations from Ford and dealership staff, suffered a financial loss from the trade in on his Class Vehicle.

15.    Plaintiff Ahmed Abdi, a resident of Oklahoma City, Oklahoma, owns a 2018 F-150 with 2.7L EcoBoost engine. He purchased the Class Vehicle in March 2019 for approximately $38,300 from Billingsley Ford in Duncan, Oklahoma. Plaintiff Abdi saw commercials advertising the Ford EcoBoost before he went to purchase the vehicle. At the dealership, Plaintiff Abdi saw the Monroney sticker on the vehicle and relied on it when purchasing the truck. Had Plaintiff Abdi known the truth about the Class Vehicle, he would have paid less for it or would have chosen to purchase a competing vehicle.

**B.      Defendant**

16.     Defendant Ford is a Delaware corporation with its principal place of business at One American Road in Dearborn, Michigan, and is therefore a citizen of the states of Delaware and Michigan.

17.     At all times relevant herein, Ford engaged in the business of designing, manufacturing, marketing, warranting, distributing, selling, and leasing automobiles, including the Class Vehicles, throughout the United States.

## IV.    JURISDICTION AND VENUE

18.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because at least one Class member is of diverse citizenship from the Defendant; there are more than 100 Class members; and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs. Subject-matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq.*

19.     The Court has personal jurisdiction over Defendant pursuant to 18 U.S.C. §§ 1965(b) and (d) and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

20.     This Court has both specific and general personal jurisdiction over Defendant because it maintains minimum contacts with the United States, this District, and this state. Ford purposely availed itself of the laws of this state by conducting a substantial amount of its business in the state, including distributing Ford vehicles,

including the Class Vehicles, in this state and District. Ford also disseminated warranty materials for the Class Vehicles in this state and District. Hundreds or thousands of Class Vehicles were sold or leased at franchise dealerships in this state and ply this state's roads.

21.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred in this District and Plaintiff Sartip is a resident of this District. Ford has marketed, warranted, sold, and leased the Class Vehicles, and otherwise conducted extensive business within this District.

## V.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.    Fuel Economy is Important to Prospective Vehicle Buyers

22.    Fuel economy is one of the primary considerations for consumers when they purchase or lease a new vehicle. This is particularly true of pickup trucks like the Class Vehicles.

23.    A 2018 research study, commissioned by Consumers Union and conducted by the American Council for an Energy-Efficient Economy and researchers from Simon Fraser University, confirms that consumers are willing to pay thousands of dollars more for a new vehicle in order to save fuel costs over the life of the vehicle, that consumers planning to buy a large SUV or pickup truck are willing to pay the most for better fuel

7

economy, and that consumers are willing to pay extra for efficiency gains among SUVs and trucks.[2]

24.     The conclusions reached in the 2018 research study are consistent with prior research on the importance of good fuel economy to prospective vehicle purchasers and lessees. For example, a survey conducted by Consumer Reports in late 2011 found that 83% of consumers in the market for a new vehicle were willing to pay more for a vehicle that offered better fuel economy.[3]

25.     A May 2018 national survey conducted by Consumer Reports similarly confirms that nearly 40% of car owners identify fuel economy as a top aspect that has the most room for improvement. Notably, the survey indicates that drivers of larger vehicles are at least two times as likely as drivers of small and midsize cars to select fuel economy as an improvement attribute. According to the survey, 78% of Americans agree that making larger vehicles such as SUVs or trucks more fuel-efficient is important, and 85% of Americans agree that automakers should continue to improve fuel economy for all vehicle types.[4]

---

[2] Keith Barry, *Car Buyers Say They'd Pay for Better Fuel Economy*, Consumer Reports (June 12, 2018), https://www.consumerreports.org/fuel-economy-efficiency/car-buyers-say-they-would-pay-for-better-fuel-economy-survey/.

[3] *Better Fuel Economy by 2025 Will Deliver Great Value to Consumers*, Consumer Reports (Dec. 30, 2011), https://advocacy.consumerreports.org/press_release/better-fuel-economy-by-2025-will-deliver-great-value-to-consumers/.

[4] *2018 Automotive Fuel Economy Survey Report*, Consumer Reports, 1 (July, 2018), https://advocacy.consumerreports.org/wp-content/uploads/2018/07/2018-Fuel-Economy-Survey-Fact-Sheet-3-1.pdf.

26.    Consumers value more fuel-efficient vehicles not only because of their lower fuel costs, but also because of the vehicles' environmental benefits. As Ford explains on its website:

> Driving fuel-efficient vehicles can help make an impact on more than just our pocketbooks—by lowering carbon emissions, these vehicles can also help benefit the planet. That's why Ford offers some fuel-efficient vehicles today and plans to provide a wide variety of fuel-efficient options in the near future. We're dedicated globally to doing our part to improve the environment. It's this type of thinking that can help us feel better about the Earth.[5]

**B.    Ford Touts the Fuel Efficiency of the Class Vehicles**

27.    Ford, undoubtedly aware of consumers' preference for more fuel-efficient vehicles in the lucrative and growing truck market, touts the fuel efficiency of the Class Vehicles in its advertising.

28.    For example, Ford's fuel economy estimates for its full-size F-150 pickup truck represent it as achieving best-in-class gas mileage, and automobile journalists have noticed:

> Ford is keen to keep its title of having the best-selling pickup truck for four decades. In 2017 America, that means having a tough-to-find combination of features, comfort, performance, and <u>something that's always elusive in the full-size truck genre, fuel economy</u>. To that end, Ford says its two-wheel drive 2018 F-150 with the 2.7-liter EcoBoost V6 and all-new 10-speed automatic can achieve a combined 22 miles per gallon. Broken down, that translates to an EPA-estimated 20 MPG in the city, with an impressive 26 MPG highway.

---

[5] *See Discover a Fuel-Efficient Future with Ford*, Ford, https://www.ford.com/fuel-efficiency/ (last visited June 5, 2019).

9

Those figures are good enough to give the F-150 best-in-class honors for fuel economy from a gas engine.[6]

29.     Similarly, before the release of the 2018 F-150:

Ford dropped a bit more information about the latest version of its money-printing pickup truck. . . . And once again, Ford gets to claim best-in-class, thanks to the 2.7-liter V6, which achieves 20 MPG city and 26 MPG highway in 2WD. The 3.3-liter V6 isn't very far behind it at 19 MPG city and 25 MPG highway. The thirstiest engine of the bunch is the high-output 3.5-liter turbo V6, which still isn't too bad at 15 MPG city and 18 MPG highway.[7]

30.     Ford is even more bullish about its newly-reintroduced mid-size Ranger pickup truck, stating that it is the "most fuel-efficient gas-powered midsize pickup in America."[8] Ford claims that the Ranger provides "a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the competition.[9] Ford represents in its marketing materials and on its window stickers that the Ranger gets "21 MPG city, 26 MPG highway and 23 MPG combined" when sold in two-wheel drive form, and "20 MPG city, 24 MPG highway and 22 MPG combined" when sold in four-wheel drive form.[10]

---

[6] Christopher Smith, *Ford F-150 Claims Best-In-Class Gas Mileage, Towing Capacity*, Motor1 (Aug. 9, 2017), https://www.motor1.com/news/176394/ford-f150-fuel-mileage-towing-capacity/ (emphasis added).

[7] Andrew Krok, *2018 Ford F-150 Touts Best-In-Class Towing, Payload, Fuel Economy*, Road Show (Aug. 10, 2017) https://www.cnet.com/roadshow/news/2018-ford-f-150-touts-best-in-class-towing-payload-fuel-economy/.

[8] *Adventure Further: All-New Ford Ranger Rated Most Fuel-Efficient Gas-Powered Midsize Pickup in America*, Ford: Media Center (Dec. 11, 2018), http://www.campaign.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html.

[9] *Id.*

[10] *Id.*

**C.      Government Regulation of Fuel Economy Reporting**

31.      Recognizing the importance of fuel economy information to consumers looking to buy or lease a new vehicle, since the mid-1970s, the federal government has required such information to be included and prominently displayed on the window sticker in every new vehicle sold in the United States.[11] The current version of the window sticker, in effect for model years 2013 to the present, requires vehicle manufacturers to provide prospective purchasers or lessees with a host of information about fuel economy, including city, highway and combined miles per gallon ("MPG") as reported to the EPA; estimated annual fuel costs (assuming a certain number of miles per year); and a comparison to the fuel costs for an average vehicle over a five year period.[12]

32.      In addition to the specific window sticker disclosure requirements discussed above, the federal government and the State of California extensively regulate vehicle manufacturers to ensure that emissions and fuel economy information is accurately and consistently reported, as well as available to potential vehicle purchasers.

33.      The fuel economy information contained on the vehicle window sticker is based on testing conducted by the vehicle manufacturer. While each manufacturer tests its own vehicles and reports the results to the EPA, the testing methods used by vehicle manufacturers have been standardized by the EPA to ensure that the fuel economy

---

[11] *See History of Fuel Economy Labeling*, EPA, https://www.epa.gov/fueleconomy/history-fuel-economy-labeling (last visited June 5, 2019).

[12] *See Fuel Economy Label Comparison*, EPA, https://www.epa.gov/fueleconomy/fuel-economy-label-comparison (last visited June 5, 2019).

11

information provided by vehicle manufacturers is reliable, repeatable, and fair across different car models.[13] As the EPA explains:

> Congress directed EPA to establish test methods and procedures to measure fuels economy of passenger cars and trucks, and to provide this information to the public. We designed our test procedures to reflect national-average, "real world" driving conditions. The tests are standardized for all vehicles and conducted in a controlled laboratory setting, ensuring they are repeatable, reliable, and fair.

> If auto manufacturers each designed their own procedure for measuring and reporting MPG, consumers would not be able to make "apples-to-apples" comparisons of mileage among different car models. By contrast, EPA's standardized test procedures create a level playing field for all vehicles. Consumers can rely on these values when trying to determine which vehicles are more fuel efficient.[14]

34.    The EPA sets forth detailed and uniform testing methodology for auto manufacturers to follow so that consumers can rely on the results as accurate "apples-to-apples" comparisons across competing manufacturers and vehicles when they make

---

[13] Since the passage of the Clean Air Act in the 1970s, California has been granted waivers by the EPA to set its own emissions standards, including CO2 (which indirectly results in regulation of fuel economy), and related certification standards, which is done by the California Air Resources Board ("CARB"). For the model years at issue in this complaint, California's emissions and testing standards are the same as those adopted by the EPA. *See* Richard K. Lattanzio et al., Cong. Research Initiative, *Vehicle Fuel Economy and Greenhouse Gas Standards: Frequently Asked Questions* 6 (2018), https://fas.org/sgp/crs/misc/R45204.pdf; *see also* Letter from Mary D. Nichols, Chairman, Air Resources Board, to The Honorable Ray LaHood, Secretary, U.S. Dep't of Transportation, and The Honorable Lisa Jackson, Administrator, EPA (July 28, 2011), https://www.epa.gov/sites/production/files/2016-10/documents/carb-commitment-ltr.pdf.

[14] Office of Transportation and Air Quality, EPA, EPA-420-F-14-015, *Fuel Economy Testing and Labeling* 6 (2014), https://nepis.epa.gov/Exe/ZyPDF.cgi/P100IENB.PDF?Dockey=P100IENB.PDF [hereinafter *EPA Fuel Economy Testing Q&A*].

purchasing decisions. The EPA describes the test methods and procedures it requires

vehicle manufacturers to use as follows:

> Testing vehicles in controlled laboratory conditions establishes a level playing field for all cars and ensures that the test results are consistent, accurate, repeatable, and equitable among different vehicle models and manufacturers. Vehicles are driven on a dynamometer (a device similar to a treadmill) using five standardized driving patterns or test cycles. These test cycles represent a variety of driving conditions including speed, acceleration, braking, air conditioning use, and ambient temperatures. The test results from the five driving cycles are combined to yield individual "city" and "highway" values, and a "combined" fuel economy value that assumes a 55% city/45% highway split.

> We also account for the impact of other conditions that may occur during ordinary driving, but which are not directly reflected in our tests, in our fuel economy calculations. These include wind, low tire pressure, rough roads, hills, snow or ice, carrying cargo, and certain between the gasoline we use for our tests and that which is typically available at the pump. Collectively, we estimate that these conditions reduce fuel economy by about 10%. This is reflected in the fuel economy values that you see on the label.[15]

35.    Because vehicles are tested indoors on a dynamometer, actual road

conditions must be simulated. The dynamometer must put resistance or "load" on the

drive wheels to simulate the resistance that the vehicle would experience on the road. The

resistance that a vehicle experiences on the road—called road load—is the "force

imparted on a vehicle while driving at constant speed over a smooth level surface from

sources such as tire rolling resistance, driveline losses, and aerodynamic drag."[16]

---

[15] *EPA Fuel Economy Testing Q&A* at 2.

[16] Letter from Byron Bunker, Director of Compliance Division, Office of Transportation and Air Quality, EPA, regarding Determination and Use of Vehicle Road Load Force and Dynamometer Settings 2 (Feb. 23, 2015), https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1 [hereinafter EPA Road Load Letter].

36.     Actual road conditions must be simulated for EPA testing on a dynamometer. The dynamometer settings are first calculated by measuring the road load force during on-road operation, which is referred to as the "road-load force specification."[17] Then, a "road-load derivation is performed to determine how much load the dynamometer will need to apply to simulate the road-load measured during the on-road test."[18] Once the dynamometer settings are calibrated to simulate the reported road load, the vehicle can be tested on the dynamometer.

37.     Since the dynamometer testing process for fuel economy is largely automated and relies on accurate inputs from the manufacturer, manipulation of the dynamometer inputs like the road load coefficients can impact the resulting measured fuel economy and is relatively unlikely to be detected.

38.     Road load can be observed by measuring the deceleration rate of a vehicle operating at high speed after the power is removed (by shifting into neutral while the vehicle is "coasting down" from high speed). The deceleration rate is a function of the road load acting on the vehicle. Measuring this deceleration rate (the loss of speed over time) and knowing a few other factors about the vehicle, such as its weight, the road load as a function of vehicle speed can be determined in the form of an equation ($RL = a + bx + cx^2$, where RL is road load, a, b and c are coefficients derived from on-road testing and

---

[17] *Id.* at 1.

[18] *Id.*

14

x is vehicle speed). This equation can be used to apply accurate loading of a vehicle on a dynamometer in a lab during certification testing to simulate real world conditions.

39.     The EPA has adopted "coastdown" testing as the approved method to determine road load force.[19] Coastdown testing provides data regarding tire rolling resistance, driveline losses, and aerodynamic drag. This data is used to program the laboratory dynamometers to simulate real world loading conditions and generate emissions and fuel economy ratings.

40.     Coastdown testing is conducted on actual roads or tracks, not in the laboratory. In a coastdown test, the vehicle is brought to a specific speed on a flat, straight road and then shifted into neutral so that it can then coast down to a specific lower speed. The amount of time that it takes the vehicle to slow down from the higher to the lower specified speed provides information that is then used to calculate the sum of forces affecting that specific vehicle.

41.     The procedures for conducting coastdown tests, the standards to be applied to those tests, and the standards for determining how the data from the tests should then be used to calculate the appropriate road load measurements have been established by the Society of Automotive Engineers ("SAE").[20] The EPA has adopted those procedures and standards in its guidance to vehicle manufacturers regarding how to conduct coastdown tests and measure road load.[21]

---

[19] *Id.* at 3; *see also* 40 CFR §1066.301(b) (2019).
[20] *See* SAE Standard J2263 (Dec. 2008) and Standard J1263 (March 2010).
[21] *See generally* EPA Road Load Letter.

42.     The procedures adopted by the EPA provide for specific conditions such as:

a. The test road or test track should be straight, smooth and level for a sufficient distance to obtain the necessary data.

b. The road or test track surface should be hard and smooth. The surface texture and composition should be similar to road surfaces commonly in use. . . .

c. [The test] must be conducted on the road or track in opposite directions with minimal interference from other vehicles during the data collection periods. During the data collection period, the track surface and vehicle should be dry and the track should be free of obstacles or significant irregularities. The absence of intermittent wind barriers near the road or track surface is preferred to reduce positional wind variations. [22]

43.     While the method that a manufacturer elects to use to characterize the road load force used in the simulation is subject to the automaker's discretion, the automaker should make determinations "using good engineering judgment."[23] The EPA has made clear that "the manufacturer is responsible for the accuracy of the road-load force specification and dynamometer settings. It is also the manufacturer's responsibility to insure [sic] that the vehicles it produces conform to the road-load specification reported in the application for certification and used for certification and fuel economy testing."[24]

44.     The EPA has also stated that "[i]t is imperative for emissions and fuel economy testing that the road-load force data specified by the manufacturer be representative of the final production fleet" and that it "considers the road-load force specification to be a vehicle characteristic similar to curb weight. Certificates of

---

[22] *Id.* at 4–5.
[23] *Id.* at 6.
[24] *Id.* at 2.

16

conformity only cover vehicles which do, in fact, conform to the road-load specifications in the application for certification." 25

45. A vehicle manufacturer's failure to conform to the applicable test procedures and reporting requirements, including the failure to properly calculate and report road load force specifications, may result in the denial of a Certificate of Conformity or the revocation of a previously issued Certificate. 26

46. After the manufacturer has measured the road load force specification and the dynamometer is calibrated to simulate the road load on the vehicle, the Vehicle is driven on the dynamometer using the five test cycles set forth by the EPA.27 The Federal Test Procedure 75 ("FTP-75") and the Highway Fuel Economy Test ("HFET") are the primary dynamometer cycles used to certify light-and medium-duty passenger cars/trucks.28 FTP-75 is used to reflect city driving and is a dynamic cycle, with rapid

---

25 *Id.* at 7–9.
26 *See generally id.*
27 *Supra* para _____.
28 *See generally* Roman Nicolas, *The different driving cycles*, Car Engineer (Jan. 5, 2013):

> In 2007, EPA decided to add 3 more cycles to the existing ones, in order to better reflect real world driving conditions.
>
> The first one is the US06, which is a complement to what is missing in FTP-75 cycle. Indeed, this cycle has a higher top speed of 80 mph (130 km/h) and some higher acceleration which represents a much more aggressive driving behavior.
>
> The SC03 is another added cycle which particularity is to be performed at 35°C ambient temperature. This is needed for taking into account the air-conditioning in fuel consumption and emissions calculations.

changes in speed and acceleration. HFET is used to assess fuel economy over highway driving and is more steady state with a higher average speed than the FTP-75. If the road load force specification is inaccurate, this will lead to inaccurate FTP (City) and HFET (Highway) fuel economy results on the dynamometer.

**D.      Overview of Ford's Road Load Testing**

47.     Based upon Plaintiffs' investigation, Ford sets fuel economy goals, including a rolling resistance target, for its vehicle models at the outset of the development cycle for each vehicle model. Ford's goals are determined through consideration of, among other factors, analysis of competitor vehicles and market research to derive fuel economy targets. That is, fuel economy goals are "top down" targets set by management. Engineers are subjected to enormous pressure to design vehicles to meet these targets.

48.     Upon information and belief, Ford's design process, which is on a three- to five-year cycle, proceeds with the fuel economy goal as a key performance metric. During each development cycle, there is an interim period where the design team's management selects a representative configuration to use in determining a vehicle's fuel economy; this configuration is then tested via simulation. If a target is not met at any stage of the design process for a particular vehicle, engineers make changes to the configuration of that vehicle in the simulation in order to meet the fuel economy goals, or else must demonstrate to management why these goals cannot be met. These changes

---

The last added cycle is the "cold cycle". This is in fact a FTP-75 performed at -7°C ambient temperature.

18

may be incremental but add up over time to have significant effects on material qualities of the vehicles.

49.    During the early stages of a development cycle, there are no vehicles available to use for an on-road road load force specification. In order to estimate road load, a design team can either select a road load coefficient from a vehicle with similar characteristics, or use models to derive a road load estimate in advance of available vehicles for on-road testing. On information and belief, Ford lacks a process to standardize the selection of road load coefficients during the development cycle, and instead leaves discretion in the selection of road load coefficients to the design team. Once the various components of a vehicle have cleared simulation and vehicles are available for testing, the vehicle moves to road load verification and certification testing.

50.    The federal standard for fuel economy for a vehicle model is the "average fleet" fuel economy. Where, as with the Class Vehicles, the characteristics of the vehicles may vary widely, with different trim or larger or smaller tires, for example, modeling the average fuel economy for a fleet can be difficult. In addition, the determination of the characteristics of the vehicles used to derive the average fleet fuel economy is based on Ford's predictions regarding the vehicle configurations likely to sell well. Given the uncertainties inherent in determining the average fleet characteristics, accurate on-road road load determination is a particularly important factor in reliably estimating average fleet fuel economy. Discrepancies between the simulated vehicle configuration and production models may result in variation between the simulated fuel economy testing

19

results and fuel economy certification tests. However, once a vehicle is configured, it is possible to conduct and test road load with precision.

51.     The EPA has historically audited between 10% and 15% of new vehicle tests submitted by manufacturers, but this has grown to 15%–20% in recent years.[29] However, even where the EPA does re-test the vehicles for emissions and fuel economy, the road load provided by the vehicle manufacturer is generally trusted and used in all subsequent testing of the vehicles. The EPA only began to conduct some confirmatory testing of road load specifications submitted by manufacturers using production vehicles in 2011 to verify the accuracy of the manufacturer's reported road load specifications.[30]

52.     The EPA describes its fuel economy ratings as "a useful tool for comparing vehicles because they are always done in precisely the same way under the same set of conditions."[31]

53.     The pressure to meet top-down fuel economy targets can lead engineers or others to depart from testing standards incrementally until regulatory standards are met, rendering the test results inaccurate.

54.     Upon information and belief, Ford engineers have departed from the EPA's standard for fuel economy testing by manipulating road load testing. Methods used by Ford engineers to manipulate test results may include mathematical manipulation or

---

[29] *EPA Fuel Economy Testing Q&A* at 9.
[30] EPA Road Load Letter at 7; *see also EPA Fuel Economy Testing Q&A* at 8.
[31] EPA, Office of Energy Efficiency and Renewable Energy, U.S. Dep't of Energy, *Model Year 2019 Fuel Economy Guide* i (June 5, 2019), https://www.fueleconomy.gov/feg/pdfs/guides/FEG2019.pdf.

adjusting vehicle equipment affecting aerodynamic drag, friction, and tire-related losses. Specifically, upon information and belief, Ford engineers have removed or adjusted vehicle mirrors, increased tire inflation beyond that prescribed by EPA to determine fuel efficiency, and adjusted brake pad positioning. These manipulations can produce artificially low road load determinations on-road that translate to artificially high MPG ratings during certification testing on a dynamometer.

**E.      Overview of Plaintiffs' Testing Results**

55.      Plaintiffs' investigation and testing of the Ford Ranger have revealed that the road load for the Ford Ranger has been understated by Ford, and this had the effect of overstating fuel economy ratings beyond any expected margin of error. Upon information and belief, Plaintiffs allege that Ford used the same flawed road load testing on the F-150, resulting in similarly overstated fuel economy ratings beyond any expected margin of error.

56.      Based on Plaintiffs' investigation and knowledge of Ford processes, Plaintiffs' experts conducted reliable, objective tests of the Ford Ranger in conformance with the procedures prescribed by EPA.

57.      Plaintiffs first conducted coastdown testing to determine the road load coefficients of a 2019 Ford Ranger. Plaintiffs' tests followed the coastdown procedures detailed in the EPA guidance at 40 CFR § 86.129-00, 40 CFR § 600.111-08, 40 CFR §§ 1066.301, and Society of Automotive Engineers ("SAE") J2263. Plaintiffs' experts filled the test vehicle with fuel, weighed it, closed air vents, and kept headlights on.

58.     Ten sets of test data were collected for coastdowns from 115 kilometers per hour ("kph") to 15 kph, with the test vehicle's speed beginning up to 5 kph above the target speed before shifting into neutral.

59.     The test location was a dry, level road, with an asphalt surface and no seams, with no other traffic in either direction during any of the tests. The tests were conducted during ambient weather conditions of mild temperature and very low wind speed. Data collected included wind speed at two locations (a point two meters in front of the vehicle and at the vehicle's midpoint), vehicle speed and inertial changes over time, and ambient conditions (track temperature, ambient temperature, barometric pressure) in accordance with SAE J2263. The test vehicle was acquired new, accrued over 4,000 miles before testing, and matched the configuration of the Test Group (KFMXT02.33MB) vehicles used by Ford and submitted to EPA in certification testing.



60.    The above photograph of the test vehicle was taken while conducting the testing described herein. Upon information and belief, the test equipment used is identical to that used by the EPA and some auto manufacturers.

61.    The resulting road loads—presented below at 10 mile-per-hour ("mph") increments—were calculated from the measured road load and compared to those calculated using the road load coefficients provided by Ford to EPA as part of their certification of the 2019 Ranger with the same Test Group identification as the test vehicle (KFMXT02.33MB). SAE JJ2263 correction factors were applied to the data during analysis.



62.     The road load versus speed equation from the on-road testing was compared to that provided by Ford to the EPA and the results indicate that the road load determined from on-road testing was higher from 10 to 80 mph than those provided by Ford to the EPA.

63.     The differences in road load varied from 6.9% higher on road at 10 mph to 1.3% higher at 60 mph (the maximum speed of the Highway Fuel Economy Test and higher than the maximum speed of the Federal Test Procedure).



64.     Plaintiffs' experts next conducted emissions and fuel economy testing to determine the difference between the actual road load and the road load Ford provided to the EPA on fuel economy. The result of this testing showed that the misrepresented road

24

load data that Ford provided to the EPA had the effect of inflating fuel economy ratings for the 2019 Ranger during certification testing.

65.     Plaintiffs' experts conducted reliable, objective tests of the Ford Ranger on a dynamometer in conformance with the procedures prescribed by the EPA. Plaintiffs' experts used the Federal Test Procedure 75 ("FTP-75") and the Highway Fuel Economy Tests ("HFET") for fuel economy testing in accordance with 40 CFR §§ 86 *et seq.*, 40 CFR § 1066.111-08, 40 CFR § 1066.810, 40 CFR § 1066.840, and SAE J2264.

66.     The vehicle was tested on a 2WD dynamometer under certification conditions over the noted drive cycles (the FTP, HFET) collecting "bag" emissions for HC, CO, CO2 and NOx (no particulate matter) and calculating fuel economy using SAE calculations from the vehicle emissions results.

67.     Before conducting testing, Plaintiffs' experts performed a road-load derivation to determine the loading coefficients for the dynamometer to simulate the road-load measured 1) using the Ford supplied road load data ("RL-A" or "Ford") and 2) using the on-road testing road load data ("RL-B" or "Test") derived from the coastdown testing described above.

68.     Fuel economy testing was conducted using both sets of road load data in triplicate, using the FTP (City) and HFET (Highway) testing —for a total of six results for each road load set.

69.     Results from the two sets of testing follow below:

| 2019 Ranger Fuel Economy Testing | | | | | | | |
|---|---|---|---|---|---|---|---|
| | RL - A (Ford) Fuel Economy | | | | | | |
| | Test 1 | Test 2 | Test 3 | Delta | Average | | |
| FTP | 26.29 | 26.33 | 26.57 | 1.06% | 26.40 | | |
| HWFET | 45.11 | 45.03 | 45.24 | 0.47% | 45.13 | | |
| | RL - B (Test) Fuel Economy | | | | | MPG Difference | MPG % Difference |
| | Test 1 | Test 2 | Test 3 | Delta | Average | | |
| FTP | 25.42 | 25.57 | 25.56 | 0.59% | 25.52 | -0.88 | -3.4% |
| HWFET | 37.19 | 37.83 | 37.85 | 1.75% | 37.62 | -7.50 | -19.9% |

70.     As shown in the chart above, the fuel economy from the Test data was 3.4%
lower on the FTP (City) and 19.9% lower on the HFET (Highway) over the triplicate
cycles.[32]

71.     Plaintiffs' testing confirms that the actual road load for the 2019 Ranger
which was higher than that used by Ford during certification (and provided to EPA)
resulted in overestimated fuel economy during Ford's certification testing. The
overestimated fuel economy ranges from 3.4% for city driving to 19.9% for highway
driving. Similar overestimates in fuel economy are expected with respect to the fuel
economy reported on the Monroney labels for affected vehicles.  Plaintiffs and Other
Parties Concur that the Class Vehicles Fail to Meet Stated Fuel Economy Ratings

---

[32] The variation between the two sets of three tests was small (shown as the "delta"),
indicating the difference in the results between the two sets of road-load coefficients
was not due to test to test variability (it was much smaller than the difference between
the two sets of tests).

72.     Even though the EPA states that an accurate window sticker will reflect the best real-world estimates of fuel economy for consumers and that in any given year, most drivers will achieve fuel economy at or very close to those estimates, the actual fuel economy numbers reported by Plaintiff, consumers and independent third parties have not been anywhere near the fuel economy ratings touted by Ford for the Class Vehicles.[33]

73.     Ford's advertised fuel economy for the F-150 conflicts with Plaintiff Abdi's own calculation of his fuel economy. Plaintiff Abdi closely monitors the gas mileage for his 2018 F-150 with 2.7L EcoBoost. Plaintiff Abdi sets the trip odometer to zero each time fills up the Vehicle's gas tank. Plaintiff then records the mileage and gallons of gasoline used the next time he fills up the tank. By comparing the gas used to the mileage, Plaintiff is able to calculate the fuel economy on his F-150. At a point when Plaintiff Abdi's calculations demonstrated that his vehicle achieved 20-20.3 MPG, the readout display in the car showed 22 MPG. Ford has advertised this version of the F-150 as achieving 20 MPG city and 26 MPG highway.[34] The majority of the miles that Plaintiff Abdi drives are highway miles. Ford's advertised fuel economy and the Vehicles own readout display conflict with Plaintiffs' own recorded fuel economy.

74.     Plaintiffs' personal observations and the results from expert testing are also consistent with analyses conducted by independent third parties. For example, Edmunds

---

[33] According to the EPA, an accurate window sticker will reflect "the best 'real-world' estimates for consumers." *EPA Fuel Economy Testing Q&A* at 1. In "any given year, [the EPA expects] that most drivers will achieve fuel economy at or very close to [their] estimates." *Id.*

[34] *Supra* ¶¶ 28-30.

has been engaged in a long-term test of a 2018 F-150 and, having accumulated more than 27,700 miles on the truck over the past year, has not been able to meet or exceed Ford's EPA fuel economy numbers, despite significant efforts to do so. As described by Edmunds, "the F-150 has settled in and gives us a great picture of the kind of real-world fuel economy an owner could expect, and it's nowhere near the EPA estimates."[35] According to Edmunds, the F-150 test vehicle has achieved only 17.4 lifetime combined MPG, while Ford claims that the combined MPG for that model is 21.[36]

75.    Car and Driver, in its review of a 2019 F-150 had a similar criticism, noting that its "real-world highway fuel-economy test" achieved only 19 MPG, "an anticlimactic 4 MPG below its official EPA rating."[37]

76.    It is not only professional car reviewers and testers that have experienced a material gap in the fuel economy experienced when compared to what Ford claims on its window stickers. For example, Fuelly.com is a website that allows vehicle owners to track, report and compare their real-world fuel economy by model, engine type, and year. For the 2017 F-150, owners with the popular 2.7-liter Ecoboost engine report a combined MPG of 18, as compared to Ford's reported combined MPG of 22. The numbers reported

---

[35] Travis Langness, *2018 Ford F-150 Long-Term Road Test: Monthly Update for April 2019*, Edmunds, https://www.edmunds.com/ford/f-150/2018/long-term-road-test/2018-ford-f-150-monthly-update-for-april-2019.html (last visited June 5, 2019) (emphasis added).

[36] *Id.*

[37] *2019 Ford F-150: Review, Pricing, and Specs*, Car and Driver, https://www.caranddriver.com/ford/f-150 (last visited June 5, 2019).

are consistent in 2018, with owners of the 2.7-liter Ecoboost engine version of the F-150 reporting combined MPG of 18.3.[38]

77.    While the new Ranger model has not been on the market for as long as the F-150, the real-world results that have been reported to date are equally disappointing when compared to Ford's claims. Twenty-six Ranger owners with 284 fill-ups and more than 81,000 miles driven to date report a combined MPG of 20.6, more than 10% below Ford's reported combined MPG of 23.[39]

78.    Professional reviewers have experienced equally disappointing (and potentially troubling) results for the Ranger. For example, one reviewer drove a four-wheel drive version of the Ranger for almost 600 miles, mostly on the highway, and reported actual MPG of just 17.8, even though the Ranger's on-board computer said that it was achieving 19 MPG.[40] Ford claims that the combined MPG for that version of the Ranger is 22.

79.    Another reviewer reported averaging only 19.5 MPG on the highway, well below Ford's claimed 24 highway MPG for the four-wheel drive version of the Ranger. Notably, in a follow-up test, the same reviewer also found that the Ranger's on-board

---

[38] *Ford F-150 MPG*, Fuelly, http://www.fuelly.com/car/ford/f-150 (last visited June 5, 2019).

[39] *Ford Ranger MPG*, Fuelly, http://www.fuelly.com/car/ford/ranger (last visited June 5, 2019).

[40] Aaron Bragman, *2019 Ford Ranger MPG: Real-World Fuel Economy*, PickupTrucks (Apr. 4, 2019), https://news.pickuptrucks.com/2019/04/2019-ford-ranger-mpg-real-world-fuel-economy.html.

29

computer reported a MPG number that was significantly higher than the actual MPG recorded by the reviewer, which again was below Ford's claimed MPG.[41]

80.     In real-world driving, the discrepancies between the fuel economy numbers claimed by Ford in its advertising and its window stickers and those being experienced by consumers will cost consumers thousands of dollars more in fuel costs over the lives of the Class Vehicles, something that was not bargained for by consumers at the time of purchase.

## F.     Ford Admits That Its Fuel Economy Ratings Are Suspect

81.     An explanation for this material discrepancy between Ford's stated fuel economy numbers for the Class Vehicles and what consumers are experiencing in the real world began to emerge earlier this year, when Ford announced an ongoing internal investigation into the Company's fuel economy and emissions certification process.

82.     On February 21, 2019, Ford filed its 2018 annual report with the Securities and Exchange Commission. In its annual report, Ford revealed, for the first time, that it had "become aware of a potential concern involving its U.S. emissions certification process" and that it could "not provide assurance that [the potential concern] will not have a material adverse effect on the Company."

---

[41] Stephen Elmer, *EPA Says the New Ford Ranger Gets 24 MPG on the Highway, But What Does It Really Get at 70 MPH?*, The Fast Lane Truck (Mar. 19, 2019), https://www.tfltruck.com/2019/03/epa-says-the-new-ford-ranger-gets-24-mpg-on-the-highway-but-what-does-it-really-get-at-70-mph-video/.

83.    Ford issued a press release the same day, in which it provided more information about this issue. According to the press release, in September 2018 "a handful of employees raised a concern through our Speak Up employee reporting channel regarding the analytical modeling that is part of our U.S. fuel economy and emissions compliance process."[42] Specifically, this related to "the vehicle road load specifications used in our testing and applications to certify emissions and fuel economy."[43]

84.    In late October 2018, Ford hired an outside law firm, Sidley Austin LLP, to conduct an investigation into the vehicle road load specifications used in its testing and applications to certify emissions and fuel economy.[44] The firm submitted initial findings to Ford, which then commenced an internal investigation in December 2018.

85.    Some of the results of that internal investigation were revealed in the February 21, 2019 press release. First, Ford disclosed that it has retained independent industry experts to assist in its investigation and an independent laboratory to conduct new coastdown testing. Ford also announced that it was "evaluating potential changes to our road-load modeling process, including engineering, technical and governance components" and that it had disclosed all of these matters to regulators. Finally, Ford

---

[42] *Ford Investigating Process for U.S. Emissions Certification Concerning Road Load*, Ford (Feb. 21, 2019), https://media.ford.com/content/fordmedia/fna/us/en/news/2019/02/21/ford-investigating-process-for-us-emissions-certification-conc.html.

[43] *Id.*

[44] Mike Colias & Stephen Nakrosis, *Ford Investigating Its Emissions Testing After Employees Raised Concerns*, The Wall Street J. (Feb. 21, 2019), https://www.wsj.com/articles/ford-motor-investigating-process-for-u-s-emissions-certification-11550786668.

31

disclosed that it was retesting the 2019 Ranger and was evaluating additional vehicles to be retested as well.

86.     On April 25, 2019, in its quarterly report for the first quarter of 2019, Ford disclosed that the U.S. Department of Justice is conducting a criminal investigation over Ford's emissions and fuel economy certification processes.[45]

87.     Based on the information Ford has publicly disclosed since February 21, 2019, on the real-world driving experiences discussed above, and on the independent investigation conducted by Plaintiffs' counsel, it appears that Ford has materially misrepresented the road load estimates involved in determining baseline fuel economy testing.

88.     By materially misrepresenting the road load specifications, Ford was able to produce unrealistic results in fuel economy and emissions testing that do not reflect the reality of on-road vehicle performance. Therefore, the tested models for Class Vehicles reported higher fuel efficiency than the actual fleet of Class Vehicles that Ford entered into the stream of commerce.

89.     The Class Vehicles were marketed and sold by Ford with what appears to be false and materially overstated fuel economy ratings. In reality, Ford cheated on its fuel economy testing and used its false testing results to materially overstate the actual fuel economy numbers that un-manipulated testing would and should have produced.

---

[45] Ford Motor Co., Form 10-Q for the period ended March 31, 2019, at 70, https://www.sec.gov/Archives/edgar/data/37996/000003799619000026/f0331201910-q.htm.

90.     While the investigation is ongoing, it appears that Ford was running road load tests under conditions and using parameters that were not in line with the written test specifications, such as by adjusting or removing vehicle mirrors, recalibrating brakes, or by using different tire pressures than those required by the test specifications.

91.     Ford's manipulation of the road load tests resulted in lower road load specifications. When the Class Vehicles were then tested on the dynamometer, the lower road load specifications were used. The results would show higher fuel economy than the actual production vehicles had.

92.     By misrepresenting road load specifications, Ford corrupted further dynamometer testing. If regulators were to retest vehicles, it was unlikely that they would retest road load specifications provided by Ford. Thus, retesting the vehicle on the dynamometer and using the same (too low) road load specifications, the regulator would obtain the same result Ford did.

93.     Vehicles must be accurately described by the vehicle manufacturer in the EPA Certificate of Conformity application "in all material respects" to be deemed covered by a valid Certificate.[46] However, the Class Vehicles differ in "material respects" from the specifications described in Ford's relevant Certificate of Conformity applications because Ford reported materially higher fuel efficiency and lower emissions in its Class Vehicles than those vehicles actually achieve in the real world.

[46] *See* 40 C.F.R. §§ 86.1848-10(c)(6) (2019).

33

94.     CARB requires a similar application from vehicle manufacturers to obtain an Executive Order, confirming compliance with California's emission regulations and that the certification vehicles are identical in all material respects to the production vehicles, before allowing the vehicles to be sold in California.

95.     Because EPA Certificates of Conformity and CARB Executive Orders for the Class Vehicles were fraudulently obtained, the Class Vehicles were never covered by valid Certificates or Executive Orders, and thus, were never offered legally for sale. Ford hid these facts from the EPA, CARB, and other regulators in order to deceive them and consumers, and Ford continues to sell and lease the illegal Class Vehicles to the public.

96.     Plaintiffs and Class members purchased these Class Vehicles based on Ford's misrepresentation of higher fuel efficiency than the Class Vehicles achieve in real-world conditions, and have been damaged as a result.

## VI.     CLASS ACTION ALLEGATIONS

### A.     Class Definitions

97.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses (collectively, the "Classes"):

> **Nationwide Class:** All persons or entities in the United States who purchased or leased model year 2017 through 2019 Ford vehicles that were marketed and sold with false fuel-economy ratings.

98.     In addition to the Nationwide class, and pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs seek to represent the following State Classes as well as any

subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at

the time of class certification:

**California State Class:**  All persons or entities in the state of California who purchased or leased model year 2017 through 2019 Ford vehicles that were marketed and sold with false fuel economy ratings.

**Missouri State Class:**   All persons or entities in the state of Missouri who purchased or leased model year 2017 through 2019 Ford vehicles that were marketed and sold with false fuel economy ratings.

**Ohio State Class:** All persons or entities in the state of Ohio who purchased or leased model year 2017 through 2019 Ford vehicles that were marketed and sold with false fuel economy ratings.

**Oklahoma State Class:**  All persons or entities in the state of Oklahoma who purchased or leased model year 2017 through 2019 Ford vehicles that were marketed and sold with false fuel economy ratings.

99.    This action has been brought and may be properly maintained on behalf of

each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

**B.    Class Certification Requirements**

100.   Certification of Plaintiffs' claims for classwide treatment is appropriate

because all Plaintiffs and Class members were injured by Ford's cheating scheme as

detailed above.

101.   **Numerosity: Rule 23(a)(1).** The members of the Classes are so numerous

and geographically dispersed that individual joinder of all Class members is

impracticable. While Plaintiffs are informed and believe that there are hundreds of

thousands of members of the Class, the precise number of Class members is unknown to

Plaintiffs, but may be ascertained from the Defendant's books and records. Class

members may be notified of the pendency of this action by recognized, Court-approved

35

notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

102. **Commonality and Predominance: Rules 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual Class members, including without limitation:

A.   whether the Defendant engaged in the conduct alleged herein;

B.   whether the Defendant designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

C.   whether the Defendant's conduct violates consumer protection statutes and constitutes breach of contract and fraudulent concealment as asserted herein;

D.   whether Plaintiffs and Class members overpaid for their Class Vehicles; and

E.   whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount.

103. **Typicality: Rule 23(a)(3).** Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the Defendant's wrongful conduct as described above.

104. **Adequacy: Rule 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the

Classes that Plaintiffs seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

105. **Declaratory and Injunctive Relief: Rule 23(b)(2).** The Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate declaratory relief, with respect to each Class as a whole.

106. **Superiority: Rule 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members individually are relatively small compared to the burden and expense that would be required to individually litigate their claims against the Defendant, so it would be impracticable for the members of the Classes to individually seek redress for the Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### A.   Discovery Rule

107.   Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, Defendant's deception.

108.   Plaintiffs and Class members could not have discovered through the exercise of reasonable diligence that Defendant was concealing the true nature of the Class Vehicles because Plaintiffs and Class members lack access to the sophisticated testing or modeling equipment used to do road load calculations and certify EPA-estimated fuel economy. Plaintiffs and Class members would have no reason to doubt Ford's reported MPG ratings and no practical way to rigorously test them independently.

109.   Plaintiffs and Class members therefore did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendant had concealed information about the Class Vehicles until shortly before this action was filed.

110.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule.

### B.   Equitable Tolling

111.   All applicable statutes of limitation have also been tolled because, as a result of Defendant's knowing, active and ongoing fraudulent concealment of the facts alleged herein, Plaintiffs could not, through the exercise of reasonable diligence, have learned of the defect until recently and any delay in bringing suit is and was excusable.

112.   Defendant knew or had reason to know that its advertised fuel economy ratings for the Class Vehicles were inaccurate from the outset because Defendant

38

calculated the road load model and conducted the testing at issue, but concealed the true

nature of the Class Vehicles. As of this filing, Ford is internally investigating the issue

and the Department of Justice has launched a criminal investigation into Ford's efficiency

testing program, but no findings of either investigation have been made public.

113.   For the foregoing reasons, Plaintiffs could not, through the exercise of

reasonable diligence, have learned of the defect until recently, and thus, all applicable

statutes of limitation have been tolled as result of Defendant's knowing concealment of

the defect alleged herein.

## C.   Equitable Estoppel

114.   Defendant was and is under a continuous duty to disclose to Plaintiffs and

Class members the true nature of the Class Vehicles. Instead, as described above, Ford

actively concealed the true character of the Class Vehicles. Plaintiffs and Class members

reasonably relied on Defendant's misrepresentations and omissions of the material facts

about the vehicles' fuel economy ratings, and Defendant is therefore estopped from

relying on any statutes of limitation in defense of this action.

## VIII.  CLAIMS FOR RELIEF

## A.   Claims Asserted on Behalf of the Nationwide Class

### COUNT I
### IMPLIED AND WRITTEN WARRANTY
### Magnuson–Moss Warranty Act (15 U.S.C. §§ 2301, et seq.)

115.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as

though fully set forth herein.

116.   Plaintiffs assert this cause of action on behalf of themselves and the other members of the Class.

117.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 15 U.S.C. § 2310(d).

118.   Defendant's Class Vehicles are a "consumer product," as that term is defined in 15 U.S.C. § 2301(1).

119.   Plaintiffs and Class members are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

120.   Defendant is a "warrantor" and "supplier" as those terms are defined in 15 U.S.C. §§ 2301(4) and (5).

121.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied or written warranty.

122.   As described herein, Defendant provided Plaintiffs and Class members with "implied warranties" and "written warranties" as those terms are defined in 15 U.S.C. § 2301.

123.   Defendant breached these warranties as described in more detail above with respect to the fuel economy standards and emissions standards for the Class Vehicles. Defendant also breached these warranties by selling Class Vehicles not covered by any valid EPA Certificates of Conformity or CARB Executive Orders.

124.   By Defendant's conduct as described herein, including knowledge of the flawed testing and test results described above and Defendant's action, and inaction, in

40

the face of the knowledge, Defendant has failed to comply with its obligations under its written and implied promises, warranties, and representations.

125.   In its capacity as warrantor, and by the conduct described herein, any attempts by Defendant to limit the implied warranties in a manner that would exclude coverage is unconscionable and any such effort to disclaim, or otherwise limit, liability is null and void.

126.   All jurisdictional prerequisites have been satisfied.

127.   Plaintiffs and members of the Class are in privity with Defendant in that they purchased the Class Vehicles from Defendant or its agents.

128.   As a result of Defendant's breach of warranties, Plaintiffs and Class members are entitled to revoke their acceptance of the Class Vehicles, obtain damages and equitable relief, and obtain costs pursuant to 15 U.S.C. § 2310.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**

129.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

130.   Uniform Commercial Code § 2-313 provides that an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the promise.

131.   Ford was a merchant or seller with respect to motor vehicles.

132.   In selling its Class Vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles provided a favorable fuel economy of specific MPGs, depending on the vehicle.

133.   Plaintiffs and Class members formed contracts with Ford at the time Plaintiffs and Class members purchased or leased their Class Vehicles. The terms of the contracts include the promises and affirmations of fact and express warranties made by Ford about the Vehicles' fuel economy through their marketing and advertising campaigns, on Ford's website and at the dealership, including the window stickers affixed to the Class Vehicles.

134.   These affirmations and promises were part of the basis of the bargain between the parties.

135.   Ford's marketing and advertising constitute express warranties, which served as part of the basis of the bargain and are part of a standardized contract between Plaintiffs and the other members of the Class, on the one hand, and Ford on the other.

136.   These warranties were not true, as the Class Vehicles did not provide the promised fuel efficiency, as described herein.

137.   Ford breached these warranties arising from its advertisements, including window stickers, because the fuel economy ratings for its vehicles were inaccurate.

138.   At all times, the 49 states listed below (Louisiana is excluded), and the District of Columbia, have codified and adopted the provisions of the Uniform Commercial Code governing the express warranty of merchantability: ALA. CODE § 7-

42

2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. §§ 47-2313 and 47-2A103; Ark. Code Ann. § 4-2-313; Cal. Com. Code §§ 2313 and 10210; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. § 42a-2-313; Del. Code Ann. tit. 6, § 2-313; D.C. Code § 28:2-313; Fla. Stat. § 672.313; Ga. Code Ann. § 11-2-313; Haw. Rev. Stat. Ann. § 490:2-313; Idaho Code Ann. § 28-2-313; 810 Ill. Comp. Stat. Ann. §§ 5/2-313; Ind. Code Ann. § 26-1-2-313; Iowa Code § 554.2313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; Me. Rev. Stat. tit. 11, § 2-313; Md. Code Ann.Com. Law § 2-313; Mass. Gen. Laws. Ch. 106, § 2-313; Mich. Comp. Laws § 440.2313; Minn. Stat. § 336.2-313; Miss. Code Ann. § 75-2-313; Mo. Rev. Stat. § 400.2-313; Mont. Code Ann. § 30-2-313; Neb. Rev. Stat. U.C.C. § 2-313; Nev. Rev. Stat. § 104.2313; N.H. Rev. Stat. Ann. § 382-A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. § 25-2-313; N.D. Cent. Code § 41-02-30; Ohio Rev. Code Ann. § 1302.26; Okla. Stat. tit. 12A, § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. Cons. Stat. § 2313; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Codified Laws § 5 7A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2.313; Utah Code Ann. § 70A-2-313; Vt. Stat. Ann. tit. 9A, § 2-313; Va. Code Ann. § 8.2-313; Wash. Rev. Code Ann. § 62A.2-313; W. Va. Code Ann. § 46-2-313; Wis. Stat. § 402.313; and Wyo. Stat. Ann. § 34.1-2-313.

139. As a direct and proximate result of Ford's breach of express warranties, Plaintiffs and members of the Class have been damaged in an amount to be determined at trial.

## COUNT III
## BREACH OF IMPLIED WARRANTY

140. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

141. Ford is and was at all relevant times a "merchant," "seller," and "lessor" with respect to motor vehicles, including the Class Vehicles.

142. The Class Vehicles are and were at all relevant times "goods."

143. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

144. The Class Vehicles, when sold or leased, and at all times thereafter, did not conform to the promise or affirmations of fact made by Ford. Specifically, as described in this Complaint, the Class Vehicles' fuel-economy ratings did not conform to the fuel-economy representations made by Ford as described herein.

145. As a direct and proximate result of Ford's breach of implied warranties, Plaintiffs and members of the Class have been damaged in an amount to be determined at trial.

## COUNT IV
## BREACH OF THE COVENANT OF GOOD FAITH
## AND FAIR DEALING

146.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

147.   The law implies a covenant of good faith and fair dealing in every contract.

148.   Ford violated the covenant of good faith and fair dealing in their contracts with Plaintiffs and members of the Class by, *inter alia*, misrepresenting to Plaintiffs and the Class the quality and performance of the Class Vehicles, including that they achieved the represented fuel economy. Plaintiffs and members of the Class accepted Ford's offers and paid to purchase or lease the Class Vehicles based on those offers.

149.   Plaintiffs and Class members performed all or substantially all of the significant duties required under their agreements with Ford.

150.   The conditions required for Ford's performance under the contracts had occurred.

151.   Ford did not provide and/or unfairly interfered with the right of Plaintiffs and Class members to receive the full benefits under the agreement due to their misrepresentations.

152.   As a direct and proximate result of Ford's breach of the covenant of good faith and fair dealing, Plaintiffs and Class members were damaged through the purchase price, higher fuel costs, and diminution in the resale value of the Class Vehicles, in an amount that will be proven at trial.

45

## COUNT V
## NEGLIGENT MISREPRESENTATION

153.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

154.   Ford had a duty to provide honest and accurate information to its customers, including Plaintiffs and Class members, so that customers could make informed decisions on the substantial purchase of automobiles.

155.   The information withheld from Plaintiffs and Class members is material and would have been considered by a reasonable person, as are the misrepresentations regarding the Class Vehicles, as detailed herein.

156.   Ford specifically and expressly misrepresented material facts to Plaintiffs and Class members regarding the fuel economy of the Class Vehicles, as described in this Complaint.

157.   Ford knew or in the exercise of reasonable diligence should have known that the ordinary consumer would be misled by Ford's misleading and deceptive advertisements.

158.   Plaintiffs and Class members justifiably relied on Ford's misrepresentations. As a direct and proximate result of Ford's conduct as described herein, Plaintiffs and members of the Class have been damaged thereby in an amount that will be proven at trial.

46

# COUNT VI
## FRAUD/FRAUD BY CONCEALMENT

159.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

160.   Ford had a duty to provide honest and accurate information to its customers, including Plaintiffs and Class members, so that customers could make informed decisions on the substantial purchase of automobiles.

161.   Ford made fuel economy representations to Plaintiffs and members of the Class regarding the fuel economy of the Class Vehicles that were not true, as described in this Complaint.

162.   In the alternative, Ford withheld and concealed from Plaintiffs true and accurate information known to Ford about the fuel economy of the Class Vehicles, as described in this Complaint.

163.   The misrepresentations, nondisclosures, and /or concealment of material facts made by Ford to Plaintiffs and the Class members, as described herein, were known, or through reasonable care should have been known, to Ford to be false and material.

164.   Ford intended to mislead Plaintiffs and members of the Class and intended that Plaintiffs and Class members rely on these misrepresentations and nondisclosures.

165.   Plaintiffs and Class members reasonably relied on Ford's representations and nondisclosures.

166.   As a direct and proximate result of Ford's conduct as described herein, Plaintiffs and Class member were harmed in an amount that will be proven at trial.

## COUNT VII
## UNJUST ENRICHMENT

167.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

168.   Because of its wrongful act and omissions, Ford charged a higher price for the Class Vehicles' than the Class Vehicles' true value.

169.   Ford has benefited and been enriched by its conduct alleged described in this Complaint and by Plaintiffs and Class members' purchase of the Class Vehicles.

170.   Ford has knowledge of this benefit.

171.   Ford has voluntarily accepted and retained this benefit.

172.   Ford has been unjustly enriched at the expense of Plaintiffs and Class members, and the retention of this benefit under the circumstances would be inequitable.

173.   Plaintiffs seek an order requiring Ford to make restitution to Plaintiffs and to the other members of the Class.

**B.   Claims Asserted on Behalf of the State Classes**

## COUNT VIII
## VIOLATION OF THE CALIFORNIA CONSUMER
## LEGAL REMEDIES ACT
## (CAL. CIV. CODE § 1750, et seq.)

174.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

175.   This claim is brought pursuant to the California Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, *et seq*.

48

176.   The Class Vehicles are "goods" within the meaning of CAL. CIV. CODE §1761 (a)).

177.   Ford is a "person" under CAL. CIV. CODE § 1761(c).

178.   The California Plaintiff and Class members are "consumers," within the meaning of CAL. CIV. CODE § 1761(d).

179.   Plaintiff's and each and every Class members' purchase and/or lease of the Vehicle constitute a "transaction" within the meaning of CAL. CIV. CODE § 1761(e).

180.   The CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]"CAL. CIV. CODE § 1770(a).

181.   Ford violated the CLRA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

182.   Ford's acts and practices, as discussed throughout this Complaint, constitute "unfair or deceptive acts or practices…which results in the sale or lease of goods to any consumer" are unlawful, as enumerated in CAL. CIV. CODE § 1770(a).

183.   Ford intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the California Plaintiff and the Class.

184.   Ford knew or should have known that its conducted violated the CLRA.

49

185.   Ford's fraudulent concealment of the true characteristics of the fuel efficiency of its Class Vehicles were material to the California Plaintiff and Class members. Absent Ford's misrepresentations and omissions, Plaintiff and the other California Class members would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not have the fuel efficiency that Ford represented the Class Vehicles contained.

186.   Ford's violations present a continuing risk to Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

187.   Ford had an ongoing duty to its customers to refrain from unfair and deceptive practices under the CLRA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

188.   Plaintiff will amend to seek actual damages and restitution pursuant to CAL. CIV. CODE § 1780. Under § 1780(a), Plaintiff seeks monetary relief against Ford measured as the diminution of the value of the Class Vehicles caused by Ford's violations of the CLRA as described in this Complaint.

189.   As Ford acted with oppression, fraud, and/or malice in engaging in the CLRA violations described in this Complaint; therefore, Plaintiff will amend to seek punitive damages pursuant to CAL. CIV. CODE §§ 1780(e), and 3294.

190.   Plaintiff also seeks injunctive relief, and the award of costs of court and attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just relief available under the CLRA that the Court deems proper.

191.   On July 9, 2019, Plaintiff provided Ford with notice of its violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a).

**COUNT IX**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, et seq.)**

192.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

193.   This claim is brought pursuant to the California Unfair Competition Law ("California UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq*.

194.   The California UCL defines unfair business competition to include any "unfair," "unlawful," or "fraudulent" business act or practice and "any unfair, deceptive, untrue, or misleading advertising."

195.   Ford's conduct, as described herein, was and is in violation of the UCL. Ford's conduct violates the UCL in at least the following ways:

   a.   By knowingly and intentionally concealing from Plaintiffs that the Class Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage per gallon is far worse than a reasonable consumer would expect given the premium prices paid for these vehicles;

   b.   By failing to disclose that fuel economy is achieved with manipulation

51

of the computer trip meter;

      c.     By marketing the Class Vehicles as fuel efficient vehicles;

      d.     By violation other California laws, including but not limited to California consumer protection laws.

196.   Ford's acts and practices, as discussed throughout this Complaint, constitute "unfair, unlawful, or fraudulent acts or practices" and/or constitute "unfair, deceptive, untrue, or misleading advertising" that violate CAL. BUS. & PROF. CODE § 17200, *et seq*.

197.   Ford intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the California Plaintiff and the Class.

198.   The California Plaintiff and Class members were deceived by Ford's failure to disclose that the Class Vehicles do not provide the fuel efficiency that was advertised and certified and that their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles

199.   The California Plaintiff and Class members reasonably relied upon Ford's false misrepresentations, and had no way of knowing that Ford's representations were false and misleading.  Absent Ford's misrepresentations and omissions, Plaintiff and the other California Class members would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not have the fuel efficiency that Ford represented the Class Vehicles contained.

52

200. Ford knew or should have known that its conducted violated the California UCL.

201. Ford's fraudulent concealment of the true characteristics of the fuel efficiency of its Class Vehicles were material to the California Plaintiff and Class members.

202. Ford had an ongoing duty to its customers to refrain from unfair and deceptive practices under the California UCL. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

203. As a direct and proximate result of Ford's violations of the California UCL, the California Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

204. The California UCL also provides for injunctive relief, restitution, and disgorgement of profits for violations. Plaintiff therefore also requests that this Court enter such orders or judgments as may be necessary to restore to Plaintiff and members of the California Class any money Ford acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345; and for such other relief as may be appropriate.

## COUNT X
## VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAWS
### (CAL. BUS. & PROF. CODE § 17500, et seq.)

205. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

53

206.   This claim is brought pursuant to the California False Advertising Laws, CAL. BUS. & PROF. CODE § 17500, *et seq.*

207.   Pursuant to California BUS. & PROF. CODE § 17500,  "It is unlawful for any …corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

208.   Ford cause to be made or disseminated, through California and the United States, advertisements in print, online, and on television formats containing materially misleading and deceptive information and omitted material information, as discussed throughout this Complaint, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, for the purpose of inducing customers, including the California Plaintiff and California Class members, to purchase and/or lease Class Vehicles.

209.   The above-described false, misleading, and deceptive advertising Ford disseminated were material, and had, and continues to have, the likelihood to deceive a reasonable consumer, in violation of CAL. BUS. & PROF. CODE § 17500.

210.    Absent Ford's misrepresentations and omissions in their advertising, Plaintiff and the other California Class members would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not have the fuel efficiency that Ford represented the Class Vehicles contained

211.    As a direct and proximate result of Ford's conduct, Plaintiff has suffered injury-in-fact and/or actual damage. Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the other California Class members any money Ford acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for any such other relief set forth below that the Court deems proper.

**COUNT XI**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**(MO. REV. STAT. § 407.010, et seq.)**

212.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

213.    This claim is brought pursuant to the Missouri Merchandising Practices Act (the "Missouri MPA"), MO. REV. STAT. § 407.010, *et seq.*

214.    The Missouri Plaintiff, Class members, and Ford are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

215. Ford was engaged in "trade" or "commerce" within the meaning of MO. REV. STAT. § 407.010(7).

216. The Class Vehicles are "merchandise" within the meaning of MO. REV. STAT. § 407.010(4).

217. The Missouri MPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020(1).

218. Ford violated the Missouri MPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

219. Ford's acts and practices, as described throughout this Complaint, constitute violations of MO. REV. STAT. § 407.020(1).

220. Ford intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Missouri Plaintiff and the Class.

221. Ford knew or should have known that its conducted violated the Missouri MPA.

56

222.   Ford's fraudulent concealment of the true characteristics of the fuel efficiency of its Class Vehicles were material to the Missouri Plaintiff and Class members.

223.   Ford's violations present a continuing risk to Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

224.   Ford had an ongoing duty to its customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

225.   As a direct and proximate result of Ford's violations of the Missouri MPA, the Missouri Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

226.   Pursuant to MO. REV. STAT. § 407.025, Plaintiffs seek actual damages, attorneys' fees, punitive damages, and any other relief available under the Missouri MPA that the Court deems just and proper.

## COUNT XII
## VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT
### (OHIO REV. CODE § 1345.01, et seq.)

227.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

228.   This claim is brought pursuant to the Ohio Consumer Sales Practices Act (the "Ohio CSPA"), OHIO REV. CODE § 1345.01, *et seq*.

229.   The Ohio Plaintiff, Class members, and Ford are all "person(s)" within the meaning of OHIO REV. CODE § 1345.01(B).

230.   The Ohio Plaintiff and Class members are "consumers" within the meaning of OHIO REV. CODE § 1345.01(D).

231.   Ford was engaged in "consumer transaction(s)" with respect to the sales and leases of Class Vehicles to Plaintiffs, as described in this Complaint, within the meaning of OHIO REV. CODE § 1345.01(A).

232.   The Ohio CSPA prohibits "unfair or deceptive act(s) or practice(s) in connection with consumer transaction(s)." OHIO REV. CODE § 1345.02(A).  An unlawful deceptive act includes representations that, "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not"; "(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not."  OHIO REV. CODE § 1345.02(B).

233.   Ford violated the Ohio CSPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

234. Ford's acts and practices, as described throughout this Complaint, constitute "unfair or deceptive acts or practices" that are unlawful, as enumerated in OHIO REV. CODE § 1345.02(B).

235. Ford intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Ohio Plaintiff and the Class.

236. Ford knew or should have known that its conducted violated the Ohio CSPA.

237. Ford's fraudulent concealment of the true characteristics of the fuel efficiency of its Class Vehicles were material to the Ohio Plaintiff and Class members.

238. Ford's violations present a continuing risk to Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

239. Ford had an ongoing duty to its customers to refrain from unfair and deceptive practices under the Ohio CSPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

240. As a direct and proximate result of Ford's violations of the Ohio CSPA, the Ohio Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

241. Pursuant to OHIO REV. CODE § 1345.09, Plaintiff seeks actual damages, an order enjoining Ford's unfair and deceptive acts or practices, attorneys' fees and costs, and any other relief available under the Ohio CSPA that the Court deems just and proper.

## COUNT XIII
## VIOLATION OF THE OHIO DECEPTIVE TRADE PRACTICES ACT
### (OHIO REV. CODE § 4165.01, et seq.)

242.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

243.   This claim is brought pursuant to the Ohio Deceptive Trade Practices Act (the "Ohio DTPA"), OHIO REV. CODE § 4165.01, *et seq*.

244.   The Ohio Plaintiff, Class members, and Ford are "person(s)" within the meaning of OHIO REV. CODE § 4165.01(D).

245.   Ford was engaged in the "course of [it's] business" within the meaning of OHIO REV. CODE § 4165.02(A), when it engaged in the conduct described in this Complaint.

246.   The Ohio DTPA provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation," the person does any of the following: "(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; … (9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; … [or] (11) Advertises goods or services with intent not to sell them as advertised." OHIO REV. CODE § 4165.02(A).

60

247.   Ford violated the Ohio DTPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

248.   Ford's acts and practices, as described throughout this Complaint, constitute "deceptive trade practices" that are unlawful as enumerated in OHIO REV. CODE § 4165.02(A).

249.   Ford intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Ohio Plaintiff and the Class.

250.   Ford knew or should have known that its conducted violated the Ohio DTPA.

251.   Ford's fraudulent concealment of the true characteristics of the fuel efficiency of its Class Vehicles were material to the Ohio Plaintiff and Class members.

252.   Ford's violations present a continuing risk to Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

253.   Ford had an ongoing duty to its customers to refrain from unfair and deceptive practices under the Ohio DTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

61

254.   As a direct and proximate result of Ford's violations of the Ohio DTPA, the Ohio Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

255.   Pursuant to OHIO REV. CODE § 4165.03, Plaintiff seeks an order enjoining Ford's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other relief available under the Ohio DTPA that the Court deems just and proper.

## COUNT XIV
## VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
## (OKLA. STAT. TIT. 15 § 751, et seq.)

256.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

257.   This claim is brought pursuant to the Oklahoma Consumer Protection Act (the "Oklahoma CPA"), OKLA. STAT. TIT. 15 § 751, *et seq*.

258.   The Oklahoma Plaintiff, Class members, and Ford are "person[s]" within the meaning of OKLA. STAT. TIT. 15 § 752(1).

259.   Ford engaged in "consumer transactions" when it engaged in the conduct described in this Complaint, within the meaning of OKLA. STAT. TIT. 15 § 752(2).

260.   The Class Vehicles constitute "merchandise" within the meaning of OKLA. STAT. TIT. 15 § 752(7).

261.   Under the Oklahoma CPA, an "unfair trade practice means any practice which offends established public policy or if the practice is immoral, unethical,

oppressive, unscrupulous or substantially injurious to consumers." OKLA. STAT. TIT. 15 § 752(14).

262.   The Oklahoma CPA prohibits, in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics …, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." OKLA. STAT. TIT. 15 § 753.

263.   Ford violated the Oklahoma CPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

264.   Ford's acts and practices, as described throughout this Complaint, constitute "unfair trade practices" that are unlawful, as enumerated in OKLA. STAT. TIT. 15 § 753.

265.   Ford intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Oklahoma Plaintiff and the Class.

266.   Ford knew or should have known that its conducted violated the Oklahoma CPA.

267.    Ford's fraudulent concealment of the true characteristics of the fuel efficiency of its Class Vehicles were material to the Oklahoma Plaintiff and Class members.

268.    Ford's violations present a continuing risk to Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

269.    Ford had an ongoing duty to its customers to refrain from unfair and deceptive practices under the Oklahoma CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

270.    As a direct and proximate result of Ford's violations of the Oklahoma CPA, the Oklahoma Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

271.    Pursuant to OKLA. STAT. TIT. 15 § 761.1, Plaintiff seeks an order enjoining Ford's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oklahoma CPA. Plaintiff also seeks, pursuant to OKLA. STAT. TIT. 15 § 761.1(B), an order that Ford pay a penalty to Plaintiff in the amount of $2,000 per violation because Ford's conduct was unconscionable within the meaning of the Oklahoma CPA.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Classes, respectfully request that the Court grant certification

64

of the proposed Nationwide Class and State Classes, designate the Plaintiffs as the named representatives of the Nationwide Class and respective State Classes, appoint the undersigned as Class Counsel, designate any appropriate issue classes or subclasses under the applicable provisions of Federal Rule of Civil Procedure 23, and that the Court enter judgment in Plaintiffs' favor and against Defendant, as follows:

A.      awarding actual, general, incidental, compensatory, consequential, and statutory damages on the claims asserted above as applicable and in an amount to be proven at trial;

B.      awarding exemplary and punitive damages in an amount to be proven at trial;

C.      awarding reasonable attorneys' fees and costs;

D.      awarding interest on the foregoing;

E.      enjoining the wrongful conduct alleged herein, ordering Ford to immediately cease testing fuel economy based on flawed road load and coastdown methods, and ordering Ford to correct its published EPA fuel economy ratings;

F.      providing all equitable relief the Court deems appropriate, including rescission, restitution, and disgorgement of unjust enrichment; and

G.      providing any other relief the Court deems just and proper.

## X.      DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all the issues so triable.

DATED this 9th day of July, 2019.

KELLER ROHRBACK L.L.P.

By *s/ Matthew J. Preusch*
Matthew J. Preusch (CSB No. 298144)
1129 State Street, Suite 8
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497
mpreusch@kellerrohrback.com

Lynn Lincoln Sarko (*pro hac vice forthcoming*)
Gretchen Freeman Cappio (*pro hac vice forthcoming*)
Ryan McDevitt (*pro hac vice forthcoming*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900, Fax (206) 623-3384
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
rmcdevitt@kellerrorhback.com

Lesley E. Weaver (CSB No. 191305)
Anne K. Davis (CSB No. 267909)
Joshua Samra (CSB No. 313050)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
(415) 445-4003
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Jonathan K. Levine (CSB No. 220289)
Elizabeth C. Pritzker (CSB No. 146267)
PRITZKER LEVINE LLP
180 Grand Avenue, Suite 1390
Oakland, CA 94612
(415) 692-0772, Fax (415) 366-6110
jkl@pritzkerlevine.com
ecp@pritzkerlevine.com